IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 19, 2010 Session


IN RE: CHRISTOPHER M., JR. ET AL.


Appeal from the Chancery Court for Knox County
No. 170829-2     Daryl R. Fansler, Chancellor


No. E2009-02564-COA-R3-PT - FILED JUNE 4, 2010


K.C. ("Grandmother") filed a petition seeking to terminate the parental rights of C.W.M. ("Father") to the minor children Christopher M., Jr. and Darius M. ("the Children"), and to adopt the Children.  The case was tried and the parties stipulated that grounds existed to terminate Father's parental rights under Tenn. Code Ann. §§ 36-1-113(g)(6) and (g)(7). After trial, the Trial Court entered its order terminating Father's parental rights finding and holding, *inter alia*, that it was in the best interest of the Children for Father's parental rights to be terminated.  Father appeals to this Court the finding that it was in the best interest of the Children for his parental rights to be terminated.  We affirm.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**


D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.


Robert A. Cole, Knoxville, Tennessee, for the appellant, C.W.M.

Wesley D. Stone, Knoxville, Tennessee, for the appellee, K.C.

# OPINION

## Background

On November 4, 1999, Father intentionally executed M.R.C. ("Mother") by shooting her twice in the head after she admitted to being pregnant by another man and told Father she was leaving him. Father pled guilty to second degree homicide and was sentenced to fifteen years at Violent 100%, Range 1. At the time that Father was sentenced, the Children were three years old and one year old respectively.

On November 15, 1999, the Juvenile Court for Knox County entered an order granting Grandmother, Mother's mother, temporary legal custody of the Children. The Children have lived with Grandmother continuously since that time. In October of 2007, Grandmother filed a petition seeking to terminate Father's parental rights to the Children, and to adopt the Children. The case was tried in November of 2009. The Trial Court entered an order allowing Father to be transported from the North East Correctional Complex where he was incarcerated at the time of trial to the Knox County Jail, and Father appeared in person at trial.

Grandmother, who testified at trial that she was born in 1961, rents a house and has lived there for nine years with the Children. Prior to Mother's murder, Grandmother lived with her son and his wife. Grandmother needed more space when she was granted custody of the Children, and so she rented the house she lives in with the Children. Her house has three bedrooms and one bathroom.

At the time of Mother's murder, Grandmother worked forty hours a week. Grandmother continued to work full time for several years after she was granted custody of the Children. The Children attended daycare while Grandmother was at work. In March of 2007, Grandmother was diagnosed with pancreatitis and had to stop working. She then took the Children out of daycare because she was staying at home and could care for them. Grandmother testified that she has gotten help with the Children from other family members. She testified that her sister, E.F., has helped her the most.

At the time of trial, the older child was thirteen years old and was involved in baseball. Grandmother testified that in the past he also had been involved in football and basketball. The younger child also is involved in baseball and had been involved in football and basketball in the past. Grandmother takes the Children to their athletic practices and games.

The younger child has an allergy problem for which he sees a doctor. The older child has allergies and also suffers from migraines. Grandmother has been taking the older child to a neurologist for two or three years for treatment for the migraines. She took him to the neurologist approximately one week before trial to change his medication because the migraines had been worse lately. The migraines had affected the older child's grades during the last grading period. Grandmother stated that the migraines have affected the older child's school work: "Because when his head starts hurting him, I mean it really hurts him bad and he has to normally lay down somewhere for about thirty minutes until it eases off, and that's at school and that, you know, affects him."

Grandmother helps the Children with their homework. Until the last grading period before the trial, the older child was a B/C student, but he failed some courses in the last term because of the migraines. Grandmother called the school and set up a meeting with his teachers. She met with four of the older child's five teachers, and they came up with the plan to keep Grandmother notified every two weeks via mail about how the older child is doing at school. Grandmother testified that the younger child is doing well in school and is an A/B student.

Grandmother receives social security and the Children get Family First and food stamps. Grandmother testified that she is able to meet her monthly obligations with this income and that she has money left over after paying for the monthly obligations which include rent, KUB, phone, and cable.

Grandmother testified that she has had no contact with Father since Mother's murder. Grandmother has allowed members of Father's family to pick the Children up at her house and take them to visit Father in prison. Father never wrote to Grandmother or to the Children after Mother's murder. He never sent birthday cards to the Children while they have lived with Grandmother. He also has never sent any child support. Prior to the filing of the petition to terminate Father's parental rights, the Children received some cards from Father through a member of Father's family.

Grandmother testified that the Children know that Father shot Mother, but think it was an accident. When asked why she has not told them that Father intentionally shot and killed Mother, Grandmother testified: "I was waiting on them to get old enough so they could - - would understand it." Grandmother testified that she has not taken any action to prevent the Children from seeing Father in prison and has done nothing to make it hard for Father to communicate with the Children. Grandmother also testified that she has not talked bad about Father to the Children.

Grandmother believes that the Children are well adjusted and thriving in the

environment she has provided for them. When asked why she wanted to terminate Father's parental rights, Grandmother stated: "Well, I have had [the Children] for ten years now and we are a family. I've had to be both mother and father. I love these boys to death and I always will. They're just like my own children. They're not like my grandchildren, they're just like my children."

Regina Hahn is employed at the Chapman Learning Center, where the Children previously attended daycare. The Children started at the Chapman Learning Center in March of 2000, several months after Mother's murder, and continued to attend until Grandmother stopped working. Ms. Hahn spent time with the Children on a daily basis while they were in daycare. When asked her impression of how Grandmother was caring for the Children, Ms. Hahn stated: "Excellent. I mean they were always clean. When they first came, [Grandmother] would call me five times a day.… Well, she would drop them off crying and pick them up crying because the boys cried really bad for the first month."

Ms. Hahn never had any concern about Grandmother's ability to raise the Children. Ms. Hahn stated that the Children appeared to be well fed and clothed. Grandmother always paid the daycare in a timely fashion. Ms. Hahn explained that Grandmother still brings the Children by the daycare to visit, and Ms. Hahn saw them the past summer during such a visit. She testified that the Children appeared: "Just like they always did, happy. You know, they came in, hugged, and went and seen some of the teachers that was there with them, and some of the children that were still there."

E.F. testified that she is Grandmother's sister. She lives in an apartment across the street from Grandmother. E.F. helps Grandmother with the Children. She stated: "Well, when [Grandmother] worked, I sometimes picked them up from school, daycare. When she was in the hospital once for about a week I kept them then. I'm around them about all the time." E.F. sees the Children "[e]very single day" and has done so the entire time that the Children have lived with Grandmother.

E.F. has no concerns about how Grandmother takes care of the Children. She stated that the Children respect Grandmother's authority and that when the Children misbehave, Grandmother will "[u]sually send them to their room." When asked if Grandmother has a temper, E.F. stated: "[Grandmother] holds her temper in, she's always done that. She doesn't have a temper." When asked, E.F. testified that even though Grandmother has pancreatitis: "She seems to take care of things no matter what." E.F. further testified that she is always there and willing to help Grandmother with the Children.

Stephanie Walker, who had dated Father's brother, testified that the Children sometimes visit her home on the weekends. She last saw the Children two or three weeks

before trial. She has seen the Children "[a]nywhere from two to four times a month" since Mother's murder.

Ms. Walker has never had any concerns about the Children's medical needs being met by Grandmother. She also has never had any concerns about the Children being well fed by Grandmother. Ms. Walker testified that the Children mind and respect Grandmother. When asked about her impression from observing Grandmother raising the Children, Ms. Walker stated: "I think she's done a very good job. I think they're in good hands." Ms. Walker stated that she has no concerns about Grandmother's ability to care for the Children in the future. Ms. Walker observed Father with the Children prior to Mother's murder and, when asked, agreed that he was a good father and that he was employed prior to the murder.

Father is incarcerated at the Northeast Correctional Complex where he is serving time for Mother's murder. When asked if he had anything to say to Grandmother, Father stated: "I would really like to apologize to her. I realize the pain I have caused to her and her family and my family. I'm truly remorseful." When asked about the way that Grandmother has taken care of the Children, Father stated: "I really appreciate it. It sounds like she's done a real good job with them. I'm real pleased with it."

During his incarceration, Father has done carpentry work, has been a teacher's aide helping others obtain their GED, has done landscaping, has worked in kitchens, has done highway work, and has done community service doing building work for churches and other nonprofit organizations. Father testified that he also worked for a laundry while in prison and admitted that he was fired from this job. When asked why he was fired, Father testified it was because "[w]e had a hostile [Inmate Relations Coordinator] that just didn't like anybody." Father also stated: "She done that because I wouldn't clean showers which was not in my job title."

When asked if it was his intention to regain custody of the Children, Father stated: "I would like to, yes." The Children have visited Father in prison and Father testified that these visits have lasted approximately six or seven hours each. An exhibit was introduced showing the prison records of the dates and times of these visitations. Father testified that it has been "about a year and a half" since he has seen the Children. Father admitted that Grandmother never has prevented him from contacting the Children. When asked if he would file for custody if the Children wanted to continue to live with Grandmother, Father stated: "No." However, when asked again if he intended to seek custody of the Children upon his release, Father stated: "If they would choose so, yes." Father testified: "I would love to go fishing with them, take them to their ballgames, just anything that - - just being with them. That's my main goal."

-5-

Father never has talked to the Children about his incarceration for Mother's murder. As far as Father is aware, the Children do not know that Father intentionally shot Mother in the head. When asked his opinion about how the Children might feel when they find out that Father intentionally killed Mother, Father stated: "They may resent me for that," and further stated that he would not blame them for that.

Father took classes and obtained his GED while in prison. Father also has taken landscaping classes, a victim's impact class, an anger management class, and a Bible correspondence course during his incarceration. Prior to his incarceration, Father was employed as a crane operator at Southeast Precast earning approximately ten dollars an hour. Father anticipates being able to obtain work upon his release from prison making approximately ten dollars an hour.

Father testified that he will be released from prison on August 4, 2012. When asked about his plan upon release, Father stated: "I plan on to go to my mother's and stay with her and get my job and try to get my own place to live and re-establish myself again." The Children will be fifteen and thirteen years old when Father is released from prison.

Father testified that he wrote some letters and cards to the Children during his incarceration and sent them to his mother's house rather than to Grandmother's. He testified that he did this out of respect for Grandmother and stated: "I just didn't want to keep reminding her."

When asked why he didn't want to be cut off from the Children, Father stated: "Because I love my boys and they're mostly all I have out there now. I just - - they're my kids." When asked if he had anything to say to the Trial Court, Father stated: "I would just like to say I would love to have my rights to my children. I know I would be a good dad. I would be a good figure for them, and I hope they see it that way."

Father admitted that he was angry with Mother when he intentionally shot her in the head, but when asked if he was angry because she was pregnant by another man, he stated: "Not so much." When asked if he was angry that Mother was leaving him, Father stated: "Somewhat." Father admitted that the Children were in the home when he shot Mother.

Father testified that he is on minimum security and has been "[o]ff and on for probably seven years." Father admitted that at times he has been switched to medium security and stated: "If you get in trouble you go to the main compound." When asked why his status was changed from minimum to medium, Father testified that he "got written up" for having a positive drug screen because he used marijuana. Father testified that the

marijuana was given to him; he did not buy it. He further admitted that prior to the right to smoke in prison being removed from inmates, he would purchase cigarettes from the prison commissary. Father has used money he earned in prison to purchase things from the commissary. In addition, Father's family occasionally put money into his prison account for him to purchase things. Father testified that he only made twenty to fifty dollars a month. Father admitted that he never sent any money to Grandmother for the benefit of the Children.

Father's mother testified at trial. She testified that prior to Mother's murder, Father "was a real good dad. He would participate and stuff." She also testified that visits between Father and the Children at the prison have gone well. Father's mother believes that Father would be a positive force in the Children's life after he is released from prison.

Patrice Lee, the Children's Guardian Ad Litem, testified. When asked for her recommendation, Ms. Lee testified:

> Well, basically I think the kids are doing great where they are with [Grandmother]. I've talked to the kids on three different occasions, twice at her home and once separately at their schools, and I think for the most part they're doing very well. I think they've got a nice home, they've got everything they need. I think she emotionally supports them, financially supports them. There was a little bit of trouble with [the older child], having some bad grades this time and I talked to him about that within the last couple of weeks and he says it's because of his migraines and he's being treated for it. But other than that, I think they're doing very, very well where they are.

> The kids, basically they know that their father shot their mother, but my understanding from everyone is that they don't know the circumstances around it. And they express that they've enjoyed seeing their dad the times they've been to prison. Of course, they didn't remember him from early on, but they enjoyed seeing their dad and enjoyed playing cards with him. They expressed an interest in wanting to be adopted but yet wouldn't mind having some contact when their dad got out.

Ms. Lee further stated: "I think they understand that where they are is their home, but yes, I think they would like for him to come to a ballgame with them if possible sometime or see him on a Saturday afternoon, that kind of thing." Ms. Lee testified "by all accounts [Father] was a good father [prior to Mother's murder] except the children were there when he killed their mother."

When asked her opinion about how learning the truth about Mother's death

would affect the Children, Ms. Lee stated:

> I think it's kind of speculative on my part but I can imagine that they would be very angry and upset. And I talked to [Grandmother] about that and she said that her family physician has arranged for them to have some counseling when that day comes, and I think that would probably be warranted.

> I would like to clear up one more thing though, too, from my report. I don't mean to imply from my report that it's all based on money, who has more money, I mean. It's based on the fact that [Grandmother] can provide them a home and puts them to bed every night and takes them to their ballgames, makes sure that they're in school, makes sure that they have their homework done and that kind of thing. I don't want my testimony to be that it has to do with who can pay the most money, because that's not it at all.

After trial, the Trial Court entered its order on November 20, 2009 finding and holding, *inter alia*:

> [Grandmother] was previously employed but currently suffers from pancreatitis that has rendered her unable to work. She receives Social Security disability for herself and assistance from Families First for the children.

> [Grandmother] has one adult child. Additionally, she has a sister who lives next door. Both of these individuals have helped [Grandmother] with the rearing of the children as needed.

> She currently resides in a three-bedroom home, which she rents. She introduced pictures of the home that established that it is clean and comfortable. The photographs depicted baseball and football trophies won by C.W.M. She testified both boys play baseball, football and basketball. C.W.M. is a pitcher and D.A.M. is a catcher.

> C.W.M. is currently under the care of a neurologist for treatment of migraine headaches and allergies. She indicated that C.W.M. has done well in school until the last semester. Apparently, he has suffered more from migraine headaches as of late and his studies have suffered for that. D.A.M. does well in school.

> She and the boys are insured through BlueCare Health Insurance. She receives $785.00 per month in social security and $192.00 per month for the

children through Families First. She is also eligible for food stamps. She indicated that she is able to provide for the children with this income and has money left over at the end of each month after paying utilities, rent, etc.

[Grandmother] testified that [Father's] family has taken the children to see their father in prison on a few occasions. The visitation record from the prison was introduced as an exhibit and it appears that D.A.M. first visited on February 4, 2001, and thereafter for a total of ten visits. There were no visits between January 2005 and February 2008. C.W.M. first visited in December 2000. He has had thirteen visits with his father to date. There were no visits between January 2005 and February 2008.

[Father] testified that he has sent a few cards to the children in care of his parents. [Grandmother] testified that these were received "quite a few years ago". As of recent, the boys have received no birthday cards or any support from their father.

[Grandmother] called Regina Haun [sic] as a witness. Ms. Haun [sic] runs the Chapman Learning Center, which is a daycare center where the boys were enrolled until [Grandmother] had to quit work in 2007. Ms. Haun [sic] testified that they were enrolled at her facility for seven years. She testified the children were always clean, well-fed and properly clothed. She had no concerns at all about [Grandmother's] ability to raise the children.

[Grandmother's sister E.F.] also testified about [Grandmother's] ability to care for the children. She indicated that [Grandmother] has done an excellent job in caring for and raising these boys. She has no concerns about [Grandmother's] care of the children. She occasionally helps her sister by picking up the children at school or caring for them when [Grandmother] is ill.

[Father] testified on his own behalf. He apparently has completed his GED while in prison. He also has taken 1200 hours of landscape training. He currently is on a community service detail building churches and doing work on community buildings. He has worked in carpentry as well as landscaping while in prison. He testified that he has taken a victim's impact class, a Bible correspondence course and an anger management class while in prison.

He acknowledged that while in prison he has failed a drug screen on at least one occasion. He admitted to marijuana use while incarcerated.

He testified that upon his release in August 2012 he would seek to visit the children if his parental rights were not terminated. He acknowledged that at that time the children would be fifteen and thirteen years old. He further stated that he would like to regain custody of his children once he was out of prison and back on his feet. He testified that he felt he would be able to find employment. Further, his uncle, … testified that he would provide [Father] a place to stay. [Father's mother] testified that she thought he would be a positive factor in the boys' life upon his release from prison.

Ms. Lee, the guardian *ad litem*, was called to testify. She has interviewed the children at least three times and was of the opinion that they were doing very well. She testified that [Grandmother] was good emotional support for the children and was able to provide financial support.

She felt that the children were interested in adoption but would not mind having contact with their father. She stated the children would like to have him attend a ballgame or some function. She stated that by all accounts prior to prison [Father] had been a good father.

Although both sides stipulated that they wanted the Court to review the GAL report, it was not provided to the Court for review. The guardian *ad litem* felt that it would be in the children's best interests for [Father's] parental rights to be terminated and for [Grandmother] to be allowed to adopt the children.

[Father] acknowledged that while in prison he earns a meager amount per month ranging from $20 to $50. He indicated that he uses this for purchasing items from the commissary, including hygiene items and cigarettes. He indicated that he had no funds left to send the children for support.

[Grandmother] and everyone involved acknowledged that the children do not know the true reason for their mother's death. They are laboring under the assumption that their father is in jail because of an accidental killing.

* * *

This is a situation where [Father] shot the children's mother in the head in anger apparently after being told she was leaving him. The children were at home at the time of the shooting.

They have been raised well by their grandmother. They have had only sporadic contact with [Father] over the years. It is clear that [Grandmother] has raised these boys and they will be fifteen and thirteen years old when [Father] is released from prison. He intends to try to establish visitation with them upon his release and even stated that he would like to regain custody.

The guardian *ad litem* indicated that if [Grandmother] was the adoptive parent of these children she could receive additional funds for their support. It appears that would not be an excessive amount, somewhere less than $200 per month.

Although [Father] has professed love for these boys he has made little effort to maintain any communication with them other than some cards sent to his parents years ago and the sporadic visits in prison. As noted, there have been long periods between visits. In essence, [Father] has no real relationship with these children and upon release would be attempting to enter their lives as a father figure when they were both into their teens.

The Court is of the opinion that [Grandmother] has proved by clear and convincing evidence that the parental rights of [Father] should be terminated and it is so ordered.

Father appeals to this Court.

## **Discussion**

Father raises one issue on appeal, whether the Trial Court erred in finding that it was in the best interest of the Children for his parental rights to be terminated.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this

Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

As pertinent to the issue on appeal, Tenn. Code Ann. § 36-1-113 provides:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2009).

The evidence in the record on appeal shows that Father has made little effort

to establish a relationship with the Children. The Trial Court specifically found:

> Although [Father] has professed love for these boys he has made little effort to maintain any communication with them other than some cards sent to his parents years ago and the sporadic visits in prison. As noted, there have been long periods between visits. In essence, [Father] has no real relationship with these children and upon release would be attempting to enter their lives as a father figure when they were both into their teens.

The evidence does not preponderate against these findings made by the Trial Court under the clear and convincing evidence standard.

The Trial Court also found that Father had failed at least one drug screen while in prison and had admitted to the use of an illegal drug while in prison. The evidence does not preponderate against these findings made by the Trial Court under the clear and convincing evidence standard.

Further, the Trial Court found that Father had failed to send any money for the Children's support despite his ability to purchase hygiene items and cigarettes from the prison commissary. The evidence does not preponderate against these findings made by the Trial Court under the clear and convincing evidence standard.

We note that the evidence in the record on appeal shows that the Children are not aware of the true circumstances surrounding their Mother's murder. They are not aware that Father intentionally executed Mother by shooting her in the head. Instead, "[t]hey are laboring under the assumption that their father is in jail because of an accidental killing." Furthermore, although Father admitted that he was angry when he intentionally shot and killed Mother, he stated he was only "[s]omewhat" angry about the fact that she wanted to leave him and "[n]ot so much" angry about the fact that she was pregnant by another man. If these assertions are true, why did Father intentionally execute Mother by shooting her in the head? It appears that even though Father has taken anger management classes and has admitted to his crime, he still refuses to admit why he was so angry that he murdered the mother of his children.

The Trial Court found that the Children were well-cared for and thriving in the environment that Grandmother has provided for them. The evidence does not preponderate against this finding made under the clear and convincing evidence standard. The evidence in the record shows that the Children have spent the vast majority of their young lives living with Grandmother, and she has clearly provided for them in the best manner possible.

-14-

After a careful and thorough review of the record on appeal in light of the relevant statutory factors, we hold that the Trial Court did not err in finding by clear and convincing evidence that it was in the best interest of the Children for Father's parental rights to be terminated. We, therefore, affirm the Trial Court's November 20, 2009 order.

### **Conclusion**

The judgment of the Trial Court is affirmed and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, C.W.M., and his surety.

_____
D. MICHAEL SWINEY, JUDGE